UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Moises Jimenez,

                Plaintiff,      Case No. 23-10745

v.                                   Judith E. Levy
                                      United States District Judge

City of Detroit,

                                      Mag. Judge Kimberly G. Altman

                Defendant.

_____/

**ORDER GRANTING DEFENDANT CITY OF DETROIT'S
MOTION FOR SUMMARY JUDGMENT [43]**

Before the Court is the City of Detroit's motion for summary judgment. (ECF No. 43.) Plaintiff Moises Jimenez claims that the City of Detroit violated his Fourteenth Amendment equal protection rights under 42 U.S.C. § 1983 (ECF No. 1, PageID.13), and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"). (*Id.* at PageID.17.)

For the reasons set forth below, the City of Detroit's motion for summary judgment is granted.

## I. Background

Plaintiff, who is of Mexican heritage and identifies as Hispanic, began working at the Detroit Police Department as a police officer in 1994. (ECF No. 46-2, PageID.621.) Plaintiff began working in the Homicide unit in 2000, and was promoted to the rank of detective in 2014. (*Id.*)

On September 22, 2012, an individual shot three people in southwest Detroit. (ECF No. 46-4.) Two victims, Rosalind Barley and Miguel Figueroa, were injured, and one victim, Ileana Cuevas, died. (*Id.*) On September 26, 2012, an individual shot and killed Thomas Edwards, who was Figueroa's brother. (ECF No. 46-5.) Plaintiff was the "officer-in-charge" for investigating these homicides and assaults. (ECF No. 46-2, PageID.621.)

After Plaintiff's investigation, Alexandre Ansari was charged and convicted for the murder of Ileana Cuevas, the assaults of Rosalind Barley and Miguel Figueroa, and possession of a firearm during the commission of a felony. (ECF Nos. 46-22, 46-23.) Ansari was found guilty by a jury on September 13, 2013. (ECF No. 46-23, PageID.681.)

Ansari filed a petition for a writ of habeas corpus in the District Court for the Eastern District of Michigan in 2016, and also wrote a letter in October 2017 to Wayne County Prosecutor Kym Worthy stating that he is innocent and requesting help. (ECF No. 46-26); *see also Ansari v. Winn*, Case No. 16-cv-13179 (E.D. Mich.). Ansari's habeas case was stayed on July 23, 2018 for a period of six months "so that the Conviction Integrity Unit of the Wayne County Prosecutor's Office may conduct an investigation and review to determine whether or not there is clear and convincing evidence that Mr. Ansari was wrongfully convicted in the underlying Wayne County criminal case." *Ansari v. Winn*, Case No. 16-cv-13179, ECF No. 14, PageID.1802 (E.D. Mich. July 23, 2018).

Carole Stanyar, a lawyer in the Conviction Integrity Unit ("CIU"), conducted the investigation into Ansari's innocence. (*See, e.g.*, ECF Nos. 46-27, 46-28, 46-29, 46-30, 46-31.) During her investigation, Stanyar interviewed Plaintiff and wrote in several memos that Plaintiff may not have fully investigated the involvement of a man named Jose Sandoval to protect his family:

> [Stanyar] asked if Jimenez knew that there was a Title III on Sandoval during the precise time period. Jimin[e]z first said "no". Later he said "I didn't want to know". He said that he was not investigating the drug dealing. However, [Stanyar] asked wasn't he

3

> investigating Sandoval for the murder? Jimenez said he did not want to be involved in this because Sandoval had ties in Texas and Mexico and Jiminez has family in both places. The feds had followed Sandoval's trail to Houston. Jiminez did not want to have to testify in federal court against Sandoval because of his family.

(ECF No. 46-29, PageID.721.) Stanyar wrote in subsequent memos that Plaintiff "admitted to deliberately failing to investigate Jose Sandoval because Sandoval is tied to a powerful Mexican drug cartel" and Plaintiff "feared his family would be killed." (ECF No. 46-30, PageID.725; *see also* ECF No. 46-31, PageID.739.) She concluded in her February 14, 2019 memo to Prosecutor Worthy that Plaintiff's failure to investigate Sandoval "distorted every aspect of his investigation and the truth-finding process" and recommended that Ansari be exonerated. (*Id.* at PageID.739, 748.)

According to Plaintiff, Stanyar and the CIU did not have the complete file of the Ansari investigation. (ECF No. 46-2, PageID.622–623.) Without citing to any part of the record, Plaintiff claims that the CIU gained a "false impression" about the investigation due to their lacking the complete file, that these "false impressions created numerous wrongly perceived holes in the homicide investigation," and that Stanyar

4

"falsely attributed statements to Plaintiff, which are blatantly racist," because she "wanted it to make sense." (ECF No. 46, PageID.601.)

On March 15, 2019, Ansari's conviction and sentence were vacated in a stipulated order. (ECF No. 46-32.) At some point after Stanyar's memos were written, Prosecutor Worthy met with DPD leadership: Christopher Graveline, who was the Director of Professional Standards, Chief James Craig, and Commander Elaine Bryant. (ECF No. 46-3, PageID.628.) Worthy informed them that there may be reason to bring criminal charges against Plaintiff based on his handling of the Ansari investigation. (*Id.*)

After this meeting, DPD's Integrity Unit began an investigation into Plaintiff. (*Id.* at PageID.629.) Pending this investigation, Plaintiff was transferred from the Homicide Unit to the General Assignment Unit. (ECF No. 46-2, PageID.623.) His reassignment resulted in the loss of certain benefits, such as "the ability to use a take-home car, the use of a computer, the use of a special radio, and the ability to work overtime hours." (*Id.*) Plaintiff claims that the "cumulative effect of these losses caused a loss in earnings" and that he also lost prestige due to the reassignment. (*Id.*)

5

The DPD investigation of Plaintiff was assigned to Lieutenant Marc Deluca in September 2019. (ECF No. 46-34, PageID.763.) For his investigation, Deluca received an approximately 270-page file from the Prosecutor's Office and/or the CIU, which was later revealed to not be the complete prosecutor's file for the Ansari investigation. (ECF No. 46-3, PageID.631; ECF No. 46-34, PageID.778–779.) Based on his investigation, including of the 270-page file, Lieutenant Deluca concluded that Plaintiff had "willfully withheld investigatory information and potential evidence of both . . . homicides from the WCPO" and "failed to follow up on investigatory leads that were exculpatory in nature." (ECF No. 46-35, PageID.810; ECF No. 46-34, PageID.776.) Deluca submitted a request for a warrant on January 15, 2020 with these conclusions (ECF No. 46-35), which was rejected by the Wayne County Prosecutor's Office on April 30, 2020. (ECF No. 46-34, PageID.778.) The Wayne County Prosecutor's Office appeared to believe that they could not prove beyond a reasonable doubt that Plaintiff had committed this crime and therefore declined prosecution. (*Id.*)

At some point, likely after the warrant request was submitted, Graveline held a *Garrity*[1] interview of Plaintiff. (ECF No. 46-3, PageID.634–635; *id.* at PageID.630.) Graveline testified that Plaintiff "adamantly denied" that he told the CIU anything about his family being in Mexico. (*Id.* at PageID.633.) Graveline also testified that Plaintiff was unable to provide any answers that could help explain perceived gaps in Plaintiff's investigation:

> The other takeaway that I remember from the interview was when pressed and asked about, well, show me where you handed over these cellphone records, he couldn't do it. He had no memory of it. Show me where you did -- that you followed up with this witness, interviewed this witness. He couldn't do that. He just had very poor notes, very poor -- anything to help kind of show what his thought process was and why he didn't follow up with particular witnesses and whatnot.

(*Id.*) In May 2020, Deluca submitted an investigative report (ECF No. 46-34, PageID.765), which "found sustained misconduct" for "[t]he failure to turn over Brady material as well as the deficit investigation, . . . the

---

[1] "A *Garrity* interview is an examination of a public employee during an internal investigation of the employee's official conduct." *Gaddis v. City of Detroit*, 649 F. Supp. 3d 469, 491 n.6 (E.D. Mich. 2023) (citing *Garrity v. New Jersey*, 385 U.S. 493 (1967)). "As a matter of Fifth Amendment right, *Garrity* precludes use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation." *McKinley v. City of Mansfield*, 404 F.3d 418, 427 (6th Cir. 2005).

7

negligent deficit investigation for not following up with certain witnesses as part of this investigation." (ECF No. 46-3, PageID.634–636.) Graveline "signed off on the sustained misconduct," which ended the investigation, and the report was "forwarded to disciplinary." (*Id.* at PageID.636.) On June 11, 2020, a notice of discipline charged Plaintiff with "1) Failure to Use Discretion During a Departmental or Criminal Investigation, and 2) Neglect of Duty, (i.e., failed to conduct thorough investigations into a murder and two felonious assault causes, failed to submit exculpatory information to the WCPO, leading to a wrongful conviction, and failed to interview witnesses or follow up on leads or conduct pertinent lineups essential to identifying suspects)." (ECF No. 46-38; *see also* ECF No. 46-3, PageID.637.) The notice of discipline also stated that there was a presumptive penalty of termination. (*Id.*; *see also* ECF No. 46-38.) Plaintiff received this notice of discipline at some point.

Because Plaintiff's notice of discipline had a presumptive penalty of termination, he was entitled to a hearing before the Chief of police or one of the Assistant Chiefs of police. (*Id.*) At these hearings, accused department members may be represented, may call witnesses, and can dispute the sustained conduct or the penalty. (*Id.* at PageID.638.)

8

At some point during the investigation, Plaintiff learned of the warrant request against him. (ECF No. 46-2, PageID.623.) Additionally, in August 2020, Plaintiff met with Lieutenant Mark Young, who was the President of the Detroit Police Lieutenants and Sergeants Association. (*Id.* at PageID.624.) Young testified that Plaintiff told him in the meeting that he wanted to retire, so Young "prepared the retirement paperwork at his request." (ECF No. 46-36, PageID.820.) Plaintiff states that Young told him that Plaintiff's termination was "inevitable," (ECF No. 46-2, PageID.624), although Young denies that he told Plaintiff that. (ECF No. 46-36, PageID.820.)

On August 11, 2020, Plaintiff submitted his retirement notification paperwork, without having his hearing. (ECF No. 46-37.) Plaintiff's retirement was effective on September 3, 2020. (ECF No. 46-38.)

## II.  Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

### III. Analysis

"To establish liability under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that he was subjected or caused to be subjected to this deprivation by a person acting under color of state law." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000). Plaintiff alleges that the City of Detroit discriminated against him in violation of the Fourteenth Amendment's equal protection clause and ELCRA. (ECF No. 1, PageID.13–14.) Specifically, he argues that the City relied on "discriminatory" and false information from Stanyar and the Wayne County Prosecuting Attorney and, as such, constructively terminated him on the basis of race or national origin. (*Id.* at PageID.14–15.)

Section 1983 and ELCRA employment discrimination claims use the same test as Title VII claims. *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014); *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462–463 (2001). "A plaintiff presenting a race-based equal protection claim can either present direct evidence of discrimination, or can establish a prima facie case of discrimination under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [ ] (1973)." *Umani v. Michigan Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008)). Here, Plaintiff does not invoke the "direct evidence" prima facie test and only discusses the burden-shifting *McDonnell Douglas* test. (*See* ECF No. 46, PageID.610.) As such, Plaintiff must set forth a prima facie case of discrimination by showing that

> (1) he was a member of a protected class, (2) he suffered an adverse employment action, (3) he was otherwise qualified for the position, and (4) he was replaced by someone outside the protected class or treated differently than a similarly situated, non-protected employee.

*Deleon*, 739 F.3d at 918; *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014); *Hazle*, 464 Mich. at 463. "If the plaintiff satisfies [his] prima facie showing, the burden shifts to the defendant to offer evidence

11

of a legitimate, non-discriminatory reason for the adverse employment action." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007); *Hazle*, 464 Mich. at 464–66. "If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson*, 498 F.3d at 570; *Hazle*, 464 Mich. at 465–66.

The parties only dispute whether Plaintiff suffered an adverse employment action (constructive discharge), and whether Defendant had a legitimate, nondiscriminatory reason for any adverse employment actions experienced by Plaintiff, i.e., whether Defendant was motivated by discriminatory animus. (*See* ECF No. 46, PageID.610; ECF No. 48, PageID.835; ECF No. 52, PageID.852–854.)

Even if Plaintiff established a prima facie case of discrimination, Defendant's motion for summary judgment must be granted because Plaintiff fails to demonstrate that Defendant's reasons were pretextual.

Plaintiff argues that "Stanyar created a race/national origin-based explanation for the alleged failures to investigate which directly evidences her discriminatory intent," and that "Defendant City of Detroit adopted and acted upon Stanyar's and Wayne County Prosecuting

12

Attorney's discriminatory intent," thus demonstrating the City's discriminatory animus. (ECF No. 52, PageID.854.) Plaintiff claims that Stanyar's alleged bias against Plaintiff can be imputed to the City through the "cat's paw theory of liability." (*Id.* at PageID.855.)

The "cat's paw" theory of liability, otherwise known as vicarious liability, "refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006)); *see also Gray v. State Farm Mut. Auto. Ins. Co.*, 159 F.4th 1024, 1032 (6th Cir. 2025). The Supreme Court recognized that an employer may be held liable under a cat's paw theory "if a supervisor [who is not the ultimate decisionmaker] performs an act motivated by [ ] animus that is *intended* by the supervisor to cause the adverse employment action, and if that act is a proximate cause of the ultimate employment action." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); *see also Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012).

13

Assuming that a defendant may be liable under a cat's paw theory for § 1983 claims,[2] Plaintiff's claim fails because he has not presented any evidence that Stanyar intended to cause "the adverse employment action," i.e., that Plaintiff would be investigated and, perhaps, constructively terminated. It is undisputed that Stanyar's relationship with Plaintiff was limited to her role as a member of the CIU, which was itself limited to its investigation of Ansari's claim of innocence. In Stanyar's memos to Prosecutor Kym Worthy, her only specific recommendation regarding Plaintiff was that he "should not be involved in any further investigation or prosecution of the case." (*See* ECF No. 46-31, PageID.748–749.) Plaintiff does not demonstrate, nor does the record reflect, that Stanyar had any recommendations regarding Plaintiff's discipline or employment beyond his work on the Ansari investigation, or that any entity should investigate Plaintiff.

---

[2] The Court notes that the Sixth Circuit has never explicitly held that a defendant may be liable under a cat's paw theory for § 1983 claims. *See Bose v. Bea*, 947 F.3d 983, 991 n.4 (6th Cir. 2020); *see also DeCrane v. Eckart*, 12 F.4th 586, 604 (6th Cir. 2021) ("Our caselaw makes clear that § 1983 defendants can be held liable only for their own conduct, so a plaintiff must show that a defendant was sufficient involved in the adverse action. What involvement is required? Does § 1983 permit a so-called 'cat's paw' theory of liability for non-decisionmakers?" (internal citations omitted)); *but see DeNoma*, 626 F. App'x at 110 (Sixth Circuit, in an unpublished opinion, using the cat's paw theory in a § 1983 gender discrimination case).

Plaintiff argues that the Court should assume that Stanyar intended for an adverse action to be taken against him because she, as a prosecutor, "would [ ] be aware that sustained instances of untruthful conduct would effectively end Plaintiff's law enforcement career." (ECF No. 52, PageID.858.) But Plaintiff's only citation to the record is former-Director Graveline's statement that he, as a former federal prosecutor, would be "reluctant" to bring charges with an officer who had a sustained Brady violation and that "a sustained finding for a violation of Brady does limit your usefulness as a police officer." (ECF No. 46-3, PageID.637.) This testimony does not provide evidence of Stanyar's intent as an employee of the Conviction Integrity Unit, who made a recommendation to the County prosecutor that Plaintiff not be involved in *this case*, and the Court finds that such an inference cannot be reasonably made without factual support. *See Galey v. May Dep't Stores Co.*, 9 F. App'x 295, 297–98 (6th Cir. 2001) ("A court need not give credence to 'mere allegations,' or draw inferences where they are implausible or not supported by 'specific facts.'").

Plaintiff also argues that the Court can infer that Prosecutor Worthy intended for adverse action to be taken against Plaintiff because

15

she expressed concern to DPD leadership that Plaintiff may have committed a crime. (ECF No. 52, PageID.857–858.) But even if Worthy intended that adverse actions be taken against Plaintiff, there is no evidence in the record that Worthy herself had discriminatory animus against Plaintiff. This piecemeal construction of a cat's paw theory—where a biased person's unbiased supervisor informs a separate government entity that criminal charges may be warranted against one of its employees—is far afield from the vicarious liability imposed in the cases presented by Plaintiff. (*See* ECF No. 52, PageID.855–856.)[3] Even in cases involving "more than one layer of supervision between the plaintiff and the ultimate decisionmaker," there was still sufficient

---

[3] Plaintiff acknowledges that "the traditional application of [the cat's paw] doctrine involves a supervisor without decision-making authority influencing the decision-maker," but presents out-of-circuit cases where courts have applied cat's paw liability when the biased individuals were "non-supervisory co-workers, non-employers such as elected officials, and third parties." (ECF No. 52, PageID.855–856.)

However, in these cases, courts required a showing of both an individual's bias and intent for an adverse action to be taken against the plaintiff. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012) (affirming grant of summary judgment when the plaintiff presented sufficient evidence that an HR manager caused him to be fired but failed to present sufficient evidence that she was motivated by a desire to retaliate); *Dixon v. Alcorn Cnty.*, No. 1:19-CV-167-SA-DAS, 2022 WL 610268, at *2, 7 (N.D. Miss. Mar. 1, 2022) (permitting cat's paw theory of liability when court clerk's employment was terminated by the County Board of Supervisors because the Board was influenced by a biased judge's complaints to the Board that he "couldn't work with the lady any longer").

16

evidence that the supervisor was biased and intended for the adverse employment action to occur. *See Marshall*, 854 F.3d at 379. As such, Plaintiff's § 1983 claim against Defendant must be dismissed.

Regarding Plaintiff's ELCRA claim, the Court notes that Plaintiff does not set forth any particular argument that any adverse employment actions Plaintiff experienced were the result of unlawful discrimination under ELCRA. (*See* ECF No. 52.) Plaintiff does not, for example, explain why the "cat's paw" theory of liability is viable under ELCRA. Nor is the Court able to locate any caselaw demonstrating that Michigan courts have applied the "cat's paw" theory to ELCRA cases. As such, Plaintiff's ELCRA claim is waived.

For the reasons set forth above, the Court concludes that Plaintiff fails demonstrate that Defendant may be liable for Stanyar or Worthy's actions, and, as such, fails to demonstrate that Defendant's reasons were pretextual. As such, Defendant is entitled to summary judgment.

## IV. Conclusion

For the reasons set forth above, Defendant City of Detroit's motion for summary judgment (ECF No. 43) is GRANTED.

IT IS SO ORDERED.

| | |
|---|---|
| Dated: December 30, 2025<br>Ann Arbor, Michigan | s/Judith E. Levy<br>JUDITH E. LEVY<br>United States District Judge |

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 30, 2025.

s/Kelly Winslow
KELLY WINSLOW
Case Manager
